# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BRANDON KEITH TAYLOR,

Plaintiff,

v.

DR. SHIRLEY GODIWALLA,

Defendant.

Case No. 24-CV-755-JPS

**ORDER**

Plaintiff Brandon Keith Taylor ("Plaintiff"), an inmate confined at Fox Lake Correctional Institution ("FLCI"), filed a pro se complaint under 42 U.S.C. § 1983 alleging violations of his constitutional rights. ECF No. 1. On September 18, 2024, the Court screened Plaintiff's complaint and allowed it to proceed on the following two claims: (1) deliberate indifference to Plaintiff's serious medical needs, in violation of the Eighth Amendment, against Defendant Dr. Shirley Godiwalla ("Dr. Godiwalla" or "Defendant"); and (2) negligence, pursuant to Wisconsin state law, against Dr. Godiwalla. ECF No. 8 at 8.

Now pending before the Court is Defendant's motion for summary judgment seeking dismissal of all claims. ECF No. 30. The motion is now fully briefed and ready for disposition. ECF Nos. 31, 41, 43. For the reasons described in detail below, the Court will grant Defendant's motion as to the federal claim, will decline to exercise supplemental jurisdiction over the state-law negligence claim, and will dismiss this action accordingly.

## 1. LEGAL STANDARD – SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

## 2. FACTUAL BACKGROUND

In accordance with the Court's scheduling order, Defendant filed undisputed proposed findings of fact in support of her motion for summary judgment. ECF No. 32. Defendant also filed a list of disputed facts. ECF No. 33. Defendant acknowledges that various facts are disputed; however, she argues that summary judgment is nonetheless still appropriate because she is entitled to judgment as a matter of law on Plaintiff's version of the facts. The Court considered facts not cited from the record where appropriate. *See* Fed. R. Civ. P. 56(c)(3) (noting that the Court may consider materials in the record not cited). As such, unless otherwise noted, the Court takes the following facts from the parties' proposed statements of fact and includes

any disputed facts in the light most favorable to Plaintiff as the non-moving party.

### 2.1 Parties

Plaintiff is a prisoner with the Wisconsin Department of Corrections ("DOC"). He was housed at FLCI at all times relevant to the claims in this lawsuit. Dr. Godiwalla has been employed as a physician by DOC's Bureau of Health Services since January 2022. She has been working at FLCI since September 2022.

### 2.2 Health Services Requests

When a DOC inmate has a medical concern, wishes to communicate with medical staff, and/or requests to be seen by Health Services Unit ("HSU") staff, he fills out a Health Service Request ("HSR") and submits it to the HSU. The HSRs are triaged by nursing staff each day. Once nursing staff has triaged and responded to an HSR, it is scanned into the inmate's personal request folder portion of their electronic medical record. A response will indicate whether the inmate is scheduled to be seen, whether the HSR is referred to another staff member, or referred for copies or a record review, or whether education materials are attached. The responder may also provide written comments. Even though an HSR may be directed to Dr. Godiwalla, HSRs are always triaged in the same manner for patient care and safety. An HSR placed in a pile for a certain staff member may contain a request for emergent care that cannot wait. Any HSRs or requests Plaintiff directed to Dr. Godiwalla would have been first reviewed by nursing staff, and she would not have seen the HSR unless it was forwarded to her by nursing staff.

### 2.3 Plaintiff's Overall Health

Plaintiff has a medical history of end-stage renal disease ("ESRD") on hemodialysis, systemic lupus erythematosus, arterial steal syndrome, inflammatory arthritis, and lupus nephritis. He also suffered peripheral vascular disease ("PVD"), atherosclerosis, hypertension, anemia, baseline tachycardia, and heartburn, among other health issues. Arterial steal syndrome happens when blood that is supposed to flow through a normal arterial pathway gets "stolen" or "diverted" into a low-resistance pathway, leaving the intended tissue or organ under-supplied. The mechanism is that blood always prefers the path of least resistance. If an abnormal connection such as an arteriovenous fistula ("AV fistula") or a vascular shunt is present as is done for hemodialysis, blood may flow away from the distal tissue and instead get diverted into the connection. This causes inadequate perfusion causing ischemic symptoms. The common clinical contexts are in dialysis access. Plaintiff's health issues are serious and chronic conditions that have long affected his overall health. In addition to the above-described health conditions, Plaintiff also has a history of substance abuse of heroin (opioids).

### 2.4 Plaintiff's Relevant Medical Care

On December 14, 2022, Plaintiff submitted an HSR complaining about the pain in his feet. Two days later, he was seen by Nurse Laura Clanderman for his bilateral foot pain and sore on his left fourth toe. Plaintiff reported the sore on his fourth toe had been there for seven to ten days. Nurse Practitioner ("NP") Kristine Lyon, who also saw Plaintiff, stated it was not clear whether it was cellulitis. Plaintiff was started on

antibiotics and referred to Dr. Godiwalla for foot pain treatment recommendations and sore toe follow-up.

On December 21, 2022, Dr. Godiwalla saw Plaintiff for his bilateral foot pain and sore on his left fourth toe. Dr. Godiwalla opined Plaintiff had an ulceration over his left fourth digit on the dorsal surface and there was a pinpoint opening. No discharge was seen, and the toe moved properly. Dr. Godiwalla ordered Cephalexin (an antibiotic) and an X-ray of Plaintiff's left foot and referred him to podiatry. Plaintiff explained to Dr. Godiwalla that he had previously been prescribed Cephalexin and that it had thus far been ineffective. ECF No. 42 at 1. Plaintiff maintains that Dr. Godiwalla ignored Plaintiff's concern and prescribed the same ineffective medication. *Id.* On December 23, 2022, Plaintiff received a left foot X-ray, which found no acute fracture or dislocation. There was also no definitive evidence of osteomyelitis, a bone infection typically caused by bacteria that can spread through the bloodstream from nearby infections or open wounds. Staff recommended a Magnetic Resonance Imaging ("MRI") for further evaluation.

On December 26, 2022, while Plaintiff was receiving dialysis, Nurse Tracy Vellema consulted with him about his left fourth toe. Nurse Vellema observed Plaintiff had a moderate size maceration covering the top of his toe, and Plaintiff stated the pain was radiating through his fifth digit and down the lateral side of his left foot. Because Plaintiff was on his second round of antibiotics and his toe seemed to be worsening, Nurse Vellema noted an advanced care provider ("ACP") would follow up with him the next day when available. On December 27, 2022, NP Lyon saw Plaintiff for his left fourth toe infection. The toe was not draining but was very sensitive

to the touch. NP Lyon also noted a slight redness lateral forefoot extending beyond the fifth toe. She ordered a left fourth toe wound culture to check inflammatory markers and rule out osteomyelitis if the nurse was able to obtain a sample. On December 28, 2022, Dr. Godiwalla sent correspondence to Plaintiff informing him of the results of his left foot X-rays. She informed him that the X-rays showed no acute fracture or dislocation, and there was no definitive evidence of osteomyelitis. This correspondence stated, in relevant part: "Recommend a repeat or CT study in 1 week or sooner if symptoms continue to persist or progress." ECF No. 41-2 at 1. Plaintiff maintains that his symptoms continued and that Dr. Godiwalla failed to timely order him a CT scan as recommended. ECF No. 42 at 1.

On January 5, 2023, Plaintiff was seen by Nurse Casey Kuehn for a follow-up of his left fourth toe. Upon examination, she noted the top of the toe was scabbed but was not reddened or draining. Also, the pad and sides of the toe were unremarkable but tender. Plaintiff had no sign of active infection. On January 6, 2023, Plaintiff was seen by Dr. Christine Sharkey at the University of Wisconsin ("UW") Hospital Rheumatology for a follow-up visit for his lupus. Imaging of his feet showed osteopenic changes of pain in setting of secondary hyperparathyroidism from renal disease. Imaging also showed fracture of the left fourth digit of his foot. Osteopenia is a bone condition where the bone mineral density is lower than normal but not low enough to be classified as osteoporosis. Plaintiff returned from offsite visit with UW Rheumatology for dialysis.

According to Plaintiff, UW staff told him that his left foot fourth toe was broken when X-rayed in September. He asked why he was not informed of this. Nurse Randi Golz reviewed an X-ray from December 23,

2022, which showed no acute fracture. Nurse Golz contacted UW Rheumatology clinic and was informed that an X-ray report from September 16, 2022 showed "[p]ossible nondisplaced fracture left foot [fourth] proximal phalanx . . . possibly due to positioning." Nurse Golz did not know why DOC was not updated of results. Nothing in the record indicates, however, that Dr. Godiwalla was involved with this September incident or aware of it. Plaintiff had a podiatry appointment scheduled, and a follow-up with HSU regarding his toe scheduled for the upcoming week.

On January 9, 2023, Plaintiff was seen by Nurse Clanderman for a follow-up for his left fourth toe. The area that was previously open several weeks ago was healed over. There was no drainage seen. Plaintiff did not cover or cushion the wound area with anything. Nurse Clanderman told Plaintiff he would be referred to Dr. Godiwalla to see if additional X-rays were needed due to continued pain. On January 12, 2023, Dr. Godiwalla saw Plaintiff for his left foot pain. Plaintiff had an ulceration over his left fourth digit on the dorsal surface, and it had healed completely. There was no discharge seen and it moved properly. Because the previous X-rays did not reflect that he developed osteomyelitis, an MRI was ordered to see if there were early changes for osteomyelitis or soft tissue abscess not seen on the X-ray to rule out suspicion of a deep infection. The parties dispute whether Plaintiff told medical staff about the bullet in his chest that could potentially interfere with receiving an MRI. *See* ECF No. 33 ¶ 3.

On January 18, 2023, Plaintiff submitted an HSR complaining about his toe pain. Within a couple days, Plaintiff was seen by Nurse Clanderman. His toe had a black/scabbed area on the previously open area of the top of the left fourth toe. There was peeling skin on the toe that Plaintiff stated had

been present for about a week. Plaintiff was scheduled for podiatry and an MRI that was ordered by Dr. Godiwalla. Dr. Godiwalla had also ordered Plaintiff medical shoes on January 12, but he did not have them yet. HSU was to follow up with laundry and the NP to see what else they could provide Plaintiff until his podiatry referral. On January 24, 2023, Plaintiff was seen in HSU by Nurse Vellema. He stated they needed to send him out to be treated immediately because nothing HSU had done had helped him and he could not take the pain anymore. Plaintiff continued to have an intact scab over the left fourth toe with some dry flaking skin around the area, and he pointed out he now had a small area to the lateral left foot that started as the first area did. Plaintiff stated when the scab falls off it oozes out yellowish pus. Nurse Vellema consulted with NP Lyon who stated that antibiotic ointment should be applied twice a day. Nurse Vellema also consulted with scheduling to see if Plaintiff's MRI could be moved up.

On January 25, 2023, Plaintiff submitted an HSR asking to go to the hospital for his toe. He stated the infection was getting worse and he was afraid of losing his toe. Nurse Rhonda Bergemann responded, telling Plaintiff that labs would be ordered to evaluate the infection or inflammation, and a provider would see him in dialysis. On January 27, 2023, NP Lyon saw Plaintiff during dialysis for his continued left fourth toe pain and now left lateral foot. The initial presentation was a scabbed area on the fourth toe which he reported was draining. A culture was never obtained in the past, and he was treated with cephalexin and doxycycline. An X-ray did not show any early signals for osteomyelitis. Upon examination, Plaintiff's left fourth toe had a 0.5-centimeter by 0.5-centimeter scabbed area, and the lateral foot had a darkened muscular area

of one centimeter by one centimeter. Plaintiff had underlying discoid lupus, but his inflammatory markers were stable. NP Lyon ordered acetaminophen for the pain.

On February 7, 2023, Plaintiff sent an HSR wanting to be sent to the hospital for his toe pain. He stated that HSU's efforts had failed, and that he had been dealing with his pain for over two months. Plaintiff was scheduled for a nursing sick call. On February 9, 2023, Nurse Vellema saw Plaintiff at HSU for his foot and left toe pain. She assured him HSU was taking the necessary steps to diagnose the problem with his left fourth toe. Upon examination, it was noted that Plaintiff had a scabbed over area with definitive spreading of the original area. There was an MRI scheduled to rule out osteomyelitis. NP Lyon also saw Plaintiff and noted that his toes were swollen, and there was an area one centimeter by one centimeter on his lateral foot which was superficially open and not draining. The skin and pedal pulses were intact. There was an MRI pending to rule out osteomyelitis and possibly calciphylaxis. Because the pain was unrelieved by Tylenol, NP Lyon ordered a short course of tramadol and scheduled a follow up with Dr. Godiwalla.

On February 15, 2023, Plaintiff was scheduled for an MRI to rule out osteomyelitis. MRI and computed tomography ("CT") scans were previously recommended by the radiologists in their readings of his foot X-rays. When an MRI is ordered, the hospitals would evaluate with patients to determine whether an MRI could be performed. The final decision of whether to perform MRI is always made by a radiologist or an MRI safety officer, based on imaging and history. When Plaintiff went for an MRI on February 15, 2023, the hospital realized that there was a bullet in Plaintiff's

chest. Therefore, they sent him back asking for a call to be made to another hospital in Fond du Lac. On February 18, 2023, Plaintiff sent an HSR again requesting to be sent to the hospital and stating the pain is unbearable. Nurse Clanderman responded telling Plaintiff he was scheduled to see Dr. Godiwalla and was assessed by nursing on February 17, 2023. On February 20, 2023, Dr. Godiwalla saw Plaintiff for his left fourth toe infection. Plaintiff stated it had become very painful and requested to go to the hospital. Upon examination, Plaintiff had an ulceration over his left fourth digit on the dorsal surface that healed completely. There was a scab present and no discharge was seen. The left fourth digit moved properly and the dorsalis pedis pulses were normal. Dr. Godiwalla informed Plaintiff that she had referred him to see a podiatrist.

On February 20, 2023, ER APNP (advanced practice nurse prescriber) Melissa Gervinski at the SSM Health Waupun Memorial Hospital examined Plaintiff. Upon examination, she noted there was a wound on the left distal dorsal fourth toe approximately one centimeter by one centimeter. There was pain and tenderness of the area upon palpation. No drainage, bleeding, swelling, erythema, warmth, or ecchymosis was noted. His sensations and capillary refill were intact. When Plaintiff was offered Tylenol for the pain, he declined. There was no radiographic evidence of osteomyelitis. APNP Gervinski's impression was that Plaintiff had a nonhealing wound of his toe. APNP Gervinski recommended that Plaintiff should follow up with wound care for further evaluation, a treatment plan, and monitoring. No new orders were placed. Plaintiff later returned to FLCI with only an X-ray done, without any MRI or a CT scan.

On February 21, 2023, Plaintiff was seen by Nurse Casey Kuehn for a follow up to his ER visit. Nurse Kuehn explained that the X-ray taken in the ER showed no significant findings, and there were no new orders provided. Plaintiff advised his pain was a ten out of a ten and demanded pain medicine. He ambulated with a steady gait, took off his shoe and sock independently, and appeared in no acute distress; therefore, Dr. Godiwalla did not order any pain medications. When Plaintiff was told he would not receive any more pain medications, he became angry and stated "this is motherfucking bullshit" and exited HSU. On February 24, 2023, Plaintiff had another X-ray of his left foot. There were no acute osseous findings. On February 27, 2023, Nurse Sarah Bruin sent Dr. Godiwalla a message informing her that Plaintiff continued to complain of pain in his left foot while on dialysis. Plaintiff requested to keep his feet down during treatment, which was normally not allowed during dialysis. Nurse Bruin also stated that Plaintiff was asking for a CT scan. Dr. Godiwalla responded on February 28, 2023, informing Nurse Bruin that there was no infection seen on Plaintiff's X-ray, so there was no need to do a CT scan. She also informed Nurse Bruin that Plaintiff wanted to get tramadol, which was not indicated nor medically necessary as he was currently on acetaminophen.

On March 1, 2023, Nurse Bruin saw Plaintiff again. Plaintiff continued to complain about pain in his left foot. Upon inspection of the foot, Nurse Bruin noticed a new black spot on the end of Plaintiff's left fourth toe on his left foot that was surrounded by pink, cracked, and peeling skin. The toe appeared slightly swollen compared to the other toes. The next day, Plaintiff was seen by Nurse Bergemann for a nursing sick call visit. At the visit with Nurse Bergemann, on March 2, 2023, Plaintiff removed his

sock which was dry with no wetness or drainage on the sock. Also, the fourth toe was dry with no drainage. He stated the wraps on his toe were too painful and refused to allow his toe to be wrapped. Plaintiff was notified he had upcoming podiatry and provider appointments. On March 3, 2023, Dr. Godiwalla sent correspondence to Plaintiff informing him that the February 24, 2023 X-ray showed no acute osseous findings. The results were normal.

On March 9, 2023, Plaintiff saw Dr. Jonathan Stroebel, a podiatrist at the SSM Health Fond du Lac Regional Clinic, for evaluation of his foot pain. Plaintiff complained of severe pain in the fourth toe, left foot that has been present for three months. He also stated he has noticed there are some areas of callus dark skin on the toe. He stated the pain can be quite severe, and he requested pain medication. Upon examination, Dr. Stroebel identified gangrene present on the dorsal aspect of the fourth toe at the distal interphalangeal joint and at the distal aspect of the toe, left foot. The gangrene was well demarcated and dry. Dr. Stroebel stated this is frequently seen in patients who are receiving dialysis and ordered a more comprehensive vascular evaluation for Plaintiff. Because Plaintiff's pain in the fourth toe was ischemic and quite severe, Dr. Stroebel ordered Norco. Plaintiff was to follow up with Dr. Stroebel as needed. Dr. Stroebel also noted that Plaintiff needed to be seen by a vascular specialist in the near future to rule out significant vascular disease as a source of his pain in both feet and to determine the appropriate course of care for the gangrenous fourth left toe. On March 9, 2023, Dr. Godiwalla ordered Plaintiff Norco for pain for his fourth toe gangrene and a consult to vascular. A few days later, she went to see him in dialysis for his left foot fourth toe pain. After she

spoke with Plaintiff about the podiatrist's findings and recommendations, he wanted to have his pain medication increased from once a day to more. Dr. Godiwalla explained that Plaintiff's infection was being addressed with dressing changes and reminded him he would not allow her to examine him properly and, because of his scab, it was hard to see what was going on underneath. Further, because she was concerned, she ordered X-rays to make sure the bone was not infected. Finally, she informed him that the day he insisted on going to the ER she did allow him to go, and he was sent home without the hospital performing any additional tests.

On March 13, 2023, Nurse Wendy Koenig sent Dr. Godiwalla a note stating that Plaintiff continued to have pain during his dialysis treatment due to his gangrene. Dr. Godiwalla stated that Plaintiff could have an additional dose of hydrocodone/APAP during dialysis if nephrology okayed it. Nurse Koenig got back to Dr. Godiwalla and informed her that nephrology did okay it and asked Dr. Godiwalla to put an order in. Patients on dialysis cannot be given drug doses like regular patients with normal kidney function. Therefore, to be safe, it is always good practice to run it by the specialist (here, the nephrologist) for approval and to give an extra dose during dialysis, as it will get cleared without causing much harm. On March 14, 2023, Dr. Godiwalla placed two different orders for Norco. One was for 5/325mg tab at bedtime for seven days for pain. The second one was for 5/325mg tab on Monday, Wednesday, and Friday (during dialysis) for three days for pain. Because she saw another hemodialysis note stating that, even though Plaintiff received his additional dose of medication, dialysis treatment was still proceeding uneventfully, on March 21, 2023, she prescribed 5/325mg Norco tab at bedtime for seven days for pain.

On March 21, 2023, Plaintiff had a left foot CT scan. The impression was no acute findings or definite evidence to suggest osteomyelitis. There was extensive peripheral arteriovascular calcifications. Two days later, Plaintiff had an ankle brachial index ultrasound. The ankle-brachial index test compares the blood pressure in the ankle with the blood pressure in the arm and helps diagnose peripheral artery disease which Plaintiff had, prior to the amputation.

On March 23, 2023, Plaintiff sent an HSR complaining that the pain medication was not helping, and his pain was extremely excruciating. He requested something be done to manage his pain. The next day, Dr. Godiwalla prescribed him 5/325mg Norco tab in morning and at bedtime for seven days for pain. On March 27, 2023, Dr. Godiwalla reviewed the ankle brachial index ultrasound Plaintiff had on March 23, 2023. The impression was noncompressible vessels with indeterminate ankle brachial index value and abnormally low bilateral brachial indices, though accurate toe pressures were reportedly difficult to measure. Dr. Godiwalla also reviewed Plaintiff's March 21, 2023 left foot CT scan. The findings were osteomyelitis of the left foot unspecified type pain on the top and bottom of toes two through five of the left foot. The plan was for Plaintiff to follow up with vascular surgery.

On March 28, 2023, Plaintiff was seen by APNP Jennifer Burgess at the SSM Health Fond du Lac Vascular Surgery Clinic for his left fourth toe discoloration. APNP Burgess opined that Plaintiff had peripheral vascular disease with gangrene toe and recommended a left lower extremity angiogram with possible intervention. APNP Burgess also noted that Plaintiff would have difficulty healing wounds given his ESRD, as well as

his lupus, and further evaluation of vascular status was needed to help him heal. She stated that because of this, the left fourth toe would likely need to be amputated in the future.

On April 2, 2023, a correctional officer called HSU to inquire into what was being done for Plaintiff's pain, as he apparently used up his current pain medication and, because it was the weekend, he could only get stock tramadol or Tylenol for discomfort. Plaintiff stated that was not enough for his pain. On April 3, 2023, Plaintiff was seen by Nurse Bergemann for increased pain in his left fourth toe. His left foot was cool and had one-plus pedal edema through the toes. The fourth toe had a beige colored crust with black hardness to the tip. Dr. Godiwalla stopped in during this visit to assess his foot. She did not make any new orders or changes at that time but decided to work with medical to determine a pain medication regiment.

On April 4, 2023, to get Plaintiff through his pain until Dr. Godiwalla could get a pain medication regiment approved, she again prescribed him with two different prescriptions of Norco. On April 5, 2023, Nurse Randi Golz noted that Plaintiff was rocking in a chair and moaning in pain. He declined Tylenol when offered. The day prior, April 4, 2023, Plaintiff was prescribed (short- term) Norco to take multiple days a week. To order opioid drugs for long-term for patients in DOC's custody, Dr. Godiwalla has to fill out an opioid non-formulary form and send it to an Associate Director who will review the patient's medical history and chart. The Associate Director would then approve the request, ask for more information, or decline the request. Dr. Godiwalla filled out an opioid non-formulary form for Plaintiff, and the request was approved on April 5, 2023.

Plaintiff was aware that Dr. Godiwalla had completed the non-formulary form. On April 5, 2023, the committee approved Dr. Godiwalla's request for Chronic Opioid Use and, on April 11, 2023, she ordered 5/325mg tablets for Plaintiff to be taken in the morning, noon, and bedtime for thirty days for pain.

On April 10, 2023, Plaintiff sent an HSR complaining that his foot was in excruciating pain even with the pain medications. Nurse Stephany Buwalda informed Plaintiff that his pain medications were renewed, and that he would have follow-up testing done soon. On April 13, 2023, Plaintiff received an angiogram at the SSM Health St. Agnes Hospital. He underwent a pelvic and left lower extremity angiogram and a recanalization and balloon angioplasty of all three tibial vessels. The angiograms were successful, and he had improved blood flow to the foot after treatment. On April 17, 2023, Dr. Godiwalla was called up to dialysis to consult with Dr. Asad Majid (nephrologist) about Plaintiff's left foot fourth toe. She explained to Dr. Majid that Plaintiff's prior ER visits resulted in the emergency room not doing much. She also relayed that she spoke with APNP Jennifer Burgess at the Fond du Lac Regional Clinic, who stated that vascular had seen Plaintiff on April 13, 2023, opened up three vessels, and were not going to do anything else because the amputation would have to be done by the podiatrist. After conferring with Dr. Majid, he suggested that Dr. Godiwalla refer Plaintiff to Fox Valley Surgical Specialists, and he was going to make arrangements for his admission under the surgical specialists.

On April 18, 2023, Plaintiff was seen by Dr. Sarah Wilson-Burger at the Fox Valley Surgical Specialists for a consultation for his gangrenous toe

and bilateral foot pain. Because he was immune suppressed and at a high risk for sepsis and infection, further evaluation to rule out sepsis was recommended. After a blood workup, Plaintiff was started on Plavix and a baby aspirin and was released back to FLCI. On April 20, 2023, Plaintiff sent an HSR complaining about the excruciating pain his toe was causing him and that the pain deprived him of sleep. Nurse Bergemann responded, informing him that the most important thing he could do was to elevate his leg/foot to improve his circulation. Good circulation is important as it efficiently delivers oxygenated blood to various parts of the body. In Peripheral Artery Disease, there can be leg pain or cramping during activity (intermittent claudication), coldness in the legs or feet, and wounds that heal poorly or not at all. Gangrene can set in, which can lead to amputation.

On April 24, 2023, after Dr. Godiwalla provided a verbal order for Plaintiff to keep his feet up while in dialysis, Nurse Golz informed him of this order. Plaintiff adamantly refused and said he would not be dialyzed if his feet must be elevated. HSU nurses discussed Plaintiff's plan of care with Dr. Godiwalla regarding his gangrenous toe. Dr. Godiwalla told the nurses to encourage Plaintiff to receive dialysis with his feet in an elevated position to help decrease the edema in his lower extremities. If he refused, they should provide him with education regarding the benefits of elevating his lower extremities to decrease edema. If he continued to refuse, they should have him fill out a Refusal of Recommended Health Care form. Dr. Godiwalla also approved a weekly complete blood count with differential for closer monitoring. However, Plaintiff still refused to dialyze with his feet elevated. On April 26 and April 28, 2023, Plaintiff continued to refuse to dialyze with his feet elevated.



Case 2:24-cv-00755-JPS Filed 09/21/26 Page 17 of 42 Document 46

On May 1, 2023, Plaintiff refused to dialyze with his feet elevated and, the next day, he sent an HSR to HSU complaining about the excruciating pain his toe was causing. Nurse Ziegler informed him he had an appointment scheduled with podiatry soon. On May 3, 5, and 8, 2023, Plaintiff continued to refuse to dialyze with his feet elevated. On May 9, 2023, Dr. Godiwalla ordered 5/325 tablets of Norco for Plaintiff to be taken in the morning, noon, and bedtime for thirty days for pain. On May 10, 2023, Plaintiff saw Dr. Stroebel at the SSM Health Fond du Lac Podiatry Clinic for his gangrenous fourth toe, left foot. Upon examination, the left foot fourth toe was gangrenous from the distal interphalangeal joint to the distal aspect of the toe. There was no surrounding erythema, edema, odor, purulence, fluctuance, or crepitus. There was no yellow, serosanguineous drainage present. Because the gangrenous changes to the toe were not improving, even though circulation in his left lower extremity was improved due to vascular intervention, Dr. Stroebel recommended that Plaintiff have a disarticulation amputation of the fourth toe at the fourth metatarsophalangeal joint.

On May 12 and 15, Plaintiff continued to refuse to dialyze with his feet elevated. On May 16, 2023, Dr. Godiwalla saw Plaintiff for his history and physical in preparation for his upcoming podiatry surgery. After a complete review of his history and full examination, Dr. Godiwalla cleared him for surgery. On May 17, 19, 22, 24, 26, 29, and 31, 2023, Plaintiff refused to dialyze with his feet elevated. Similarly, on June 2, 5, 7, 9, 12, 16, 19, 21, 23, 26, 28, and 30, 2023, Plaintiff continued to refuse to dialyze with his feet elevated. On June 8, 2023, Dr. Godiwalla ordered Plaintiff a prescription of Norco. On June 23, 2023, Dr. Stroebel performed a disarticulation

amputation of Plaintiff's fourth toe at the fourth metatarsophalangeal joint, left foot.

On June 28, 2023, Dr. Stroebel saw Plaintiff for a postoperative evaluation after his fourth toe amputation. Upon examination, the bandaging on the left foot was clean, dry, and intact. The incision at the fourth metatarsophalangeal joint was well approximated. All sutures were intact and in position. The edema was mild. Ecchymosis was absent. Sensation was intact to light touch to the remaining four toes of the left foot. Plaintiff did not complain of much pain with palpation to the surgical sites. There was no fluctuance or crepitus with palpation to the surgical site. Plaintiff was healing well and without incident. A fresh compressive dressing was applied. Plaintiff was to continue to keep his left foot clean and dry, wear his surgical shoe at all times, minimize activity, and keep the left foot elevated.

On July 3, 2023, Plaintiff refused to dialyze with his feet elevated, and two days later, he saw Dr. Stroebel for another postoperative evaluation. Plaintiff stated he continued to have significant left foot pain. The pain was not at the surgical site but in his big toe. Upon examination, the bandaging was clean, dry, and intact. The incision at the fourth metatarsophalangeal joints was well approximated. All sutures were intact and in position. Edema was minimal around the surgical sites. Ecchymosis was absent. Sensation was intact to light touch to the remaining four toes of the left foot. Plaintiff did not complain of pain with light palpation to the surgical site. There was no fluctuance or crepitus present with palpation to the surgical site. The big toe of the left foot was edematous and mildly warm to touch. Plaintiff had significant pain with light palpation to the big toe.

There was more pain with attempted range of motion of the big toe interphalangeal joint. A blister was present at the plantar lateral aspect of the fifth metatarsal which appeared dry. There was no surrounding erythema or edema. It was very painful with palpation. It measured approximately four centimeters by two centimeters. The skin was intact. There was no surrounding erythema, edema, odor, purulence, fluctuance, or crepitus. Plaintiff was healing well, and the sutures were removed. However, he had developed some blistering along the plantar lateral aspect of the fifth metatarsal of his left foot. It could have happened from favoring his left foot or from wearing the surgical shoes but was likely aggravated by bandaging. It would take time for the blister to resolve and his pain to subside. Dr. Stroebel was concerned that Plaintiff had developed gout in the big toe of the left foot, and Plaintiff was to follow-up with him in two weeks. On July 5, 2023, Dr. Godiwalla prescribed one 5/325mg tablet of Norco for Plaintiff to be taken by mouth in the morning, at noon, and at bedtime for thirty days for pain from his toe amputation. Plaintiff continued to refuse to dialyze with his feet elevated.

On July 6, 2023, Plaintiff sent an HSR complaining about new, excruciating pain in his left foot since surgery, and the next day, Nurse Amy Ziegler saw him and asked if he was doing any ankle or foot exercises since surgery, to which Plaintiff responded no. Upon examination, there was redness noted on the side of foot by the fifth toe. The area was not warm to the touch. The foot was painful with palpation and was cool to the touch due to poor circulation. The pedal pulse was faint but palpable. Nurse Ziegler provided Plaintiff with a printout of foot and ankle exercises to do and instructed him to keep his left foot elevated and to start moving it to

improve pain; on July 7, 2023, he refused to dialyze with his feet elevated. On July 9, 2023, Plaintiff sent an HSR complaining that his entire foot was always cold, and that his toes stayed numb and painful all day. He did not believe his foot was getting any circulation. He was scheduled for a nursing sick call and provider appointment, if needed. On July 10, 2023, Plaintiff refused to dialyze with his feet elevated, and the next day, he saw Nurse Erin Quass in response to his HSR in which he complained about his left foot being cold and his toes being numb and painful all day. On assessment, his amputation of fourth digit wound was open with dried and fresh blood with white/bone visible. Plaintiff also appeared to have boggy and red wound to outer left foot under digits. The provider assessed Plaintiff's foot and ordered wound care.

On July 12, 2023, Plaintiff continued to complain of numbness and pain in his big toe, and APNP Amy Denneau ordered two different prescriptions of oxycodone for his post-operative pain. On July 13, 2023, Nurse Kuehn was called out to the hall during medication pass because Plaintiff was requesting garbage bags so he could shower. He stated that two days ago, Dr. Godiwalla told him not to get his foot wet. Nurse Kuehn spoke with Dr. Godiwalla, and she clarified that the wound was to be left open. When Nurse Kuehn advised Plaintiff of this, he became very angry. On July 13, 2023, Plaintiff presented to HSU for wound care. Upon examination, in the interphalagic space between his fourth toe amputation, and his fifth toe, there was a wound present. The wound appeared to be a full thickness fissure into the skin. It was very tender to touch. The area had a moderate amount of draining. The wound was cleaned, and Plaintiff was advised to keep the post-operation surgical shoe off his foot as much as he

could to reduce pressure. On July 14, 2023, Nurse Kuehn call podiatry and spoke with Dr. Stroebel about Plaintiff's current wound care management with the Medi honey, bacitracin, and DuoDERM dressing. Dr. Stroebel advised that was perfect and he would see Plaintiff next week. Plaintiff continued to refuse to dialyze with his feet elevated. On July 16, 2023, Plaintiff sent an HSR again complaining about his excruciating pain from his other four toes. Nurse Vellema informed Plaintiff that HSU had reached out to podiatry and were awaiting their plan.

On July 17, 2023, Nurse Kiser informed Plaintiff that HSU called podiatry and was waiting for direction from them. Plaintiff continued to refuse to dialyze with his feet elevated. On July 18, 2023, Plaintiff was seen by Dr. Stroebel in podiatry. Upon examination, the incision for the fourth toe amputation was well approximated and appeared healed. At the dorsal aspect of the incision, there was a dark discoloration of the skin and possible evidence of the development of a new gangrenous area. A blister was present along the lateral aspect of the fifth metatarsal of the left foot. The blister was intact and there was minimal fluctuance. There was no surrounding erythema or edema. It was painful with palpation, but the blister had not increased in size from Plaintiff's previous visit. While Plaintiff's surgical site appeared stable, there was increased discoloration of the dorsal aspect of the incision consistent with development of some localized gangrenous changes. The foot was extremely cold to the touch with edema. Plaintiff was given Percocet for severe pain and was instructed to apply warm compresses to the dorsal and plantar aspect of the left foot. He was to keep his left leg in a dependent position with the knee straight to try to assist with as much vascular perfusion to the left lower extremity as

possible. Plaintiff understood there were possible further gangrenous changes to the left foot that would require further amputation of either the toes or the entire lower extremity; however, the next day, on July 19, 2023, Plaintiff continued to refuse to dialyze with his feet elevated. On July 19, 2023, Plaintiff presented to HSU for a dressing change. Because of the pain he was experiencing, the fact he had a low-grade fever and increased white blood count, and his podiatry appointment was not for a couple days, HSU sent Plaintiff to the ER. When Plaintiff presented at the ER for his cold, swollen, and painful left foot, the ER examined him and decided to admit him to further assess his significant peripheral vascular disease and to consult vascular. On July 19, 2023, Plaintiff saw SSM Health St. Agnes Hospital's Dr. Sela Sherr. On repeat evaluation, Plaintiff stated that his pain was somewhat improved. His foot X-ray did not show any clear early signs of osteomyelitis. His CT angio did show chronic possibly worsening stenosis with lead pipe appearance of multiple vessels. Dr. Sherr discussed this with vascular surgeon Dr. Shahriar Alizadegan, who stated that he knew Plaintiff well, that Plaintiff was already scheduled for an angiogram on Friday, and that "[n]o acute intervention [was] needed at this time."

On July 20, 2023, Plaintiff saw St. Agnes Hospital Infectious Diseases' Dr. Adetunji Adejumo for a consult regarding his foot infection. Upon review of Plaintiff's fourth toe surgical amputation site, there were no current, clear signs of a surgical wound infection, but he did have peripheral vascular disease. Plaintiff was to continue with left foot surgical site wound care and follow vascular surgery for his left ischemic foot pain. He was to see Dr. Alizadegan to do an angiogram and possible angioplasty. On July 21, 2023, Plaintiff was seen by Dr. Alizadegan at SSH Health St.

Agnes Hospital—Fond Du Lac. Dr. Alizadegan reviewed Plaintiff's prior history and physical examination. Dr. Alizadegan noted no change occurred in Plaintiff's condition since the prior history and physical examination was completed. Plaintiff was scheduled for left lower extremity angiogram and intervention. Per Dr. John Hoch's notes, when Plaintiff was seen at SSH Health on July 21, he had an additional angioplasty, and his anterior and posterior tibialis arteries were recanalized and revascularized using conventional and tapered balloon. Both the anterior and posterior were 100% stenosed before intervention. Plaintiff noted that one week later he began to have worsening pain and discoloration of the remaining toes. 100% stenosed anterior and posterior tibialis arteries (100% occlusion) is a complete blockage of blood flow to the toes from the anterior and posterior tibialis.

On July 27, 2023, HSU Nurse Buwalda spoke with a hospital nurse, who explained that Plaintiff had an angioplasty of his foot which showed his foot was positive for blood flow. He also had an abscess drained to the lateral left foot. The hospital was subsequently sending him back to FLCI on antibiotics and pain medication. Plaintiff's diagnosis was left foot pain, ischemic foot ulcer due to atherosclerosis of native artery of limb. Specifically, his CT angiogram showed diffuse atherosclerotic change involving both lower extremities. Severe stenosis was also suspected in the distal popliteal artery bilaterally. On July 27, 2023, Plaintiff saw Nurse Quass, who assessed his left foot and determined the great toe was boggy, purple, and red, with pockets of fluid and divets on top of the toe. She also found the second and third digits were black in color and fluid filled in appearance. Plaintiff reported no sensation felt on bottom of toes and severe

pain across tops of toes and top and side of foot. The area where the fourth digit was previously amputated was open with red granulation tissue as well as yellow sloughing and was weeping serosanguinous fluid. Plaintiff refused dressing removal on the side of his foot that was drained due to pain level at this time. Nurse Quass informed Plaintiff that wound cares were daily and appointments had been scheduled with nursing, as well as a follow-up appointment with the provider.

On July 28 and 29, 2023, Plaintiff presented to HSU for wound care. He stated his foot looked worse than it did the day before. The top of the great toe was black and wrinkled, as well as his third toe. The area between the amputation and the fifth toe was macerated. The lateral side of his foot was open, with a whitened area as well. His foot was warm and pedal pulses present. On July 31, 2023, Dr. Godiwalla saw Plaintiff during his wound care. The left great toe, second toe, and third toe showed gangrenous changes only at the tip of the toes. There were skipped areas on the foot's lateral aspect. The amputated area was pink with granulation tissue seen. There was no malodor present, and the foot was warm. Dr. Godiwalla could not feel the pulsations because of the edema that was present. HSU continued the Keflex as well as the Flagyl and acidophilus and noted that Plaintiff would be seeing his surgeon soon. Plaintiff continued to refuse to dialyze with his feet elevated. On August 1, 2023, Plaintiff presented to HSU for wound care.

On August 2, 2023, Plaintiff refused to dialyze with his feet elevated. He had an office visit with Dr. Stroebel at UW Health—Fond du Lac Podiatry for left foot reevaluation. Dr. Stroebel noted that Plaintiff had complete collapse of the vascular supply to his left foot with significant

occlusion of the popliteal artery behind the knee and 100% occlusion of all three arteries in the lower extremity below the knee. Plaintiff did undergo vascular intervention with Dr. Alizadegan. The blood supply was partially restored to the left foot. Plaintiff was hospitalized at the time of the procedure. He was seen in the hospital after the procedure had been performed. It was noted at that time that he had dark discoloration at the distal aspect of several of his toes. There was concern of further gangrenous changes to the left foot. Upon examination, Dr. Stroebel noted that Plaintiff's incision for the fourth toe amputation, left foot, remained approximated. There was some bloody, serosanguineous drainage present. Also, Plaintiff continued to have some discoloration of the margins of the incision that developed prior to his revascularization. The blister along the lateral aspect of the fifth metatarsal, left foot, was debrided and removed by Dr. Alizadegan; however, there was pink, thin skin present at the blister site except in the central aspect where small area of eschar had developed. The area was not erythematous or edematous. There was no purulence or odor. There was no fluctuance or crepitus. It was extremely painful with light touch. Dr. Stroebel further noted that Plaintiff had developed black discoloration of the distal aspect of the big, second, third, and fifth toes. The big toe was fairly dry, but the second, third, and fifth toes were moist. There was bloody, serosanguineous drainage. There was no capillary refill time to the distal aspect of any of the toes. The toes were extremely painful with palpation. No fluctuance or crepitus was noted. Dr. Stroebel's assessment was that Plaintiff developed gangrene of his big, second, third, and fifth toes, left foot, and that his best options for further treatment would be to consider either a transmetatarsal amputation or a below-the-knee

amputation. On August 4, 7, and 9, 2023, Plaintiff continued to refuse to dialyze with his feet elevated. On August 11, 2023, Nurse Kiser noted during wound care that Plaintiff's big toe was mushy on the pad of the toe and the fresh new skin was turning black, which had not been like that before. Plaintiff continued to refuse to dialyze with his feet elevated. On August 14, 16, and 18, 2023, Plaintiff continued to refuse to dialyze with his feet elevated. On August 17, 2023, Dr. Godiwalla ordered one 5/325mg tab Norco for Plaintiff to take by mouth (crush and float) in the morning, at noon, and at bedtime for thirty days for foot pain. Plaintiff submits refusal of healthcare forms dated August 9, 2023 and August 14, 2023. ECF No. 41-2 at 3-4. Plaintiff maintains that Dr. Godiwalla instructed medical staff to stop requesting Plaintiff to elevate his legs. *Id.*; *see also* ECF No. 41 at 5.

On August 21, 2023, a nurse from the vascular clinic called back the scheduler, MPAA Bassuener, and asked for HSU provider to evaluate the foot and call if this was an emergent situation or whether it could wait for one month. Dr. Godiwalla evaluated Plaintiff's left foot and stated this was emergent and he needed to be seen before one month. Dr. Godiwalla stated she would call the doctor at the vascular clinic and inform him of the plans. On August 21, 2023, UW Vascular called and spoke with both MPAA Bassuener and Dr. Godiwalla about Plaintiff's urgent referral that Plaintiff be sent to the clinic. Dr. Godiwalla informed them that she did not want to wait for their September clinic for Plaintiff to be seen. Later in the day on August 22, 2023, UW Vascular called MPAA Bassuener and stated the on-call vascular surgeon wanted Dr. Godiwalla to speak with the surgeon where Plaintiff initially was seen (Fond du Lac Vascular Clinic) to determine if he should be seen there prior to transferring care to UW

Vascular. If the Fond du Lac Vascular Clinic did not feel as if they could provide a solution, UW Vascular would like Fond du Lac Vascular Clinic to call them directly to transfer care. At that point, UW Vascular would consider doing a direct admit instead of waiting for the September clinic date.

On August 22, 2023, MPAA Bassuener spoke with UW Vascular and was informed a follow-up appointment with them was scheduled in a few weeks. Plaintiff was hospitalized from August 22, 2023, until his discharge on September 1, 2023. He was admitted to UW Hospital and Clinics under vascular surgery for ischemic tissue loss status post left trans-metatarsal amputation. His past medical history included lupus, ESRD on hemodialysis through left-sided tunneled line, and upper gastrointestinal bleeding. He presented to the UW ER with a left foot dry gangrene and was admitted for workup and management. He had consults from nephrology and ESRD team, interventional radiology for right central venous catheter placement/right internal jugular placement.

On August 23, 2023, Plaintiff underwent a CT Angio, but it was unable to be completed due to his complications with chronic kidney disease and need for contrast. On August 24, 2023, he had ankle-brachial indexes performed. On August 25, 2023, he underwent a left trans-metatarsal amputation with Dr. Tefera. During Plaintiff's post-operation course, he had adjustments to medications, and Adult Pain Services was consulted for assistance with pain control. He worked with physical therapists on regular basis and was to remain non-weight bearing for two weeks then begin using heel weight bearing at FLCI. He was on aspirin and

Plavix for his vascular disease. He was to follow-up at the vascular clinic on September 22, 2023.

On August 31, 2023, Plaintiff was discharged from UW Health Vascular Surgery. Discharge instructions were non-weight bearing left lower extremity and to elevate left leg to reduce swelling. His wounds were to also be monitored for signs and symptoms of infection such as redness, swelling, drainage, or odor. Plaintiff was not to soak his foot, but he could shower and was to have wound care daily. On September 1, 2023, HSU Nurse Ziegler saw Plaintiff, who stated he was feeling better but still having a lot of pain. Ziegler discussed with Plaintiff his pain medications and the plan established for him on August 22, 2023. He agreed with the plan and verbalized understanding. On September 3, 2023, Plaintiff notified HSU that his pain was only a six out of ten after taking his pain medications. Plaintiff continued to refuse to dialyze with his feet elevated.

On September 6, 2023, Dr. Godiwalla saw Plaintiff after his return from the hospital. Plaintiff presented to the UW Hospital ER with a left foot dry gangrene and was admitted for work-up and management. Upon examination, the left dressing was clean, dry, and intact without any discharge. While in the hospital, Plaintiff was given oxycodone. Plaintiff took three pills at a time on the first day. Subsequently, he was taking it three times a day and had completed all sixty tablets within a very short time, between September 1 and 6, 2023, leaving only three tablets left. This clearly showed Dr. Godiwalla that Plaintiff was abusing the medication. Therefore, Dr. Godiwalla told Plaintiff that he would not be given any more oxycodone because clearly, he did not need so many at each setting which he was taking, and that he would go back to his regular Norco as given by

class III. Plaintiff agreed, and Dr. Godiwalla ordered hydrocodone-acetaminophen one tablet by mouth in the morning, at noon, and at bedtime for thirty days for pain. She also ordered 25mg tablets of amitriptyline. Plaintiff was to take one tablet orally at bedtime for 180 days. On September 6 and 8, 2023, Plaintiff continued to refuse to dialyze with his feet elevated. With Plaintiff's 100% stenosed anterior and posterior tibialis arteries (100% occlusion) condition, Dr. Godiwalla believed this could only be properly addressed by offsite vascular specialists who have the expertise and medical instruments to treat the condition and properly treated in a hospital setting with the necessary equipment.

## 3. ANALYSIS

Defendant brings a motion for summary judgment seeking dismissal of the Eighth Amendment claim for deliberate indifference to his serious medical need. ECF No. 31 at 3. Defendant also requests that the Court relinquish supplemental jurisdiction over the state-law negligence claim. *Id.* at 15. Defendant recognizes that some material issues of fact exist, but argues that that she is entitled to judgment as a matter of law when taking the facts in the light most favorable to Plaintiff. Based on the Court's review of the parties' submissions, and for the reasons explained below, the Court will grant Defendant's motion for summary judgment on the federal claim, will decline to exercise supplemental jurisdiction over the state-law negligence claim, and will dismiss this case.

### 3.1 Deliberate Indifference to a Serious Medical Need

Plaintiff proceeds on an Eighth Amendment deliberate indifference claim against Defendant for her alleged indifference to his serious need for treatment of his foot pain. To prove that Defendant violated his rights under

the Eighth Amendment, Plaintiff must present evidence establishing that he suffered from "'an objectively serious medical condition'" and that Defendant was "'deliberately, that is subjectively, indifferent'" to that condition. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). A prison official shows deliberate indifference when he or she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). "'A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Gayton v. McCoy,* 593 F.3d 610, 620 (7th Cir. 2010)). A broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. *Id.* at 861 (citing *Edwards v. Snyder,* 478 F.3d 827, 831 (7th Cir. 2007) (collecting cases)). On the other hand, a prison medical staff "that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution." *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (1997) (quoting *Cooper v. Casey,* 97 F.3d 914, 916 (7th Cir. 1996)).

Under the Eighth Amendment, an incarcerated person does not have the right to direct his own course of treatment. *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). Likewise, an incarcerated person's

disagreement "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may prison officials "doggedly persist[ ] in a course of treatment known to be ineffective." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). To defeat Defendant's motion for summary judgment, Plaintiff must present evidence showing the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Id.* at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting,* 839 F.3d at 662. The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did[.]" *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to

be ineffective but is chosen anyway. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Finally, "[a] delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). The length of delay that is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'" *Id.* (quoting *McGowan*, 612 F.3d at 640). To prevail on an Eighth Amendment claim alleging a delay in providing treatment, the plaintiff "must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730–31. Such evidence may include a showing in the plaintiff's medical records that "the patient repeatedly complained of enduring pain with no modifications in care." *Id.* at 731; *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

To begin its analysis, Defendant does not argue that Plaintiff did not have an objectively serious medical need. ECF No. 31. The Court is satisfied that Plaintiff's medical condition, resulting in the amputation of Plaintiff's toes, constituted an objectively serious medical condition and therefore satisfies the first prong of the deliberate indifference standard.

Instead, Defendant argues that she was not deliberately indifferent to Plaintiff's medical needs. The Court begins with the well-established rule that when considering claims of deliberate indifference, the Court must give deference to a medical professional's judgment regarding treatment decisions. "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so

responded under those circumstances.'" *Sain v. Wood,* 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County,* 163 F.3d 982, 988 (7th Cir. 1998). Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation. *Johnson,* 433 F.3d at 1013. Federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. *Roe,* 631 F.3d at 857; *Sain,* 512 F.3d at 895. "But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision." "When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted." *Zaya,* 836 F.3d at 805 (emphasis in original).

Here, the Court finds that the record does not support a finding that Dr. Godiwalla's conduct rose to the high level of deliberate indifference. As the factual record above reflects, Plaintiff received comprehensive medical treatment for his foot condition. Indeed, Dr. Godiwalla referred Plaintiff to numerous specialists for his condition, allowed him to see hospital providers outside of the clinic, and provided various pain management options. Although Plaintiff disagreed with the treatment he received and the ultimate outcome, this is insufficient to meet the high burden of deliberate indifference. Plaintiff has provided no evidence to show that no minimally competent professional would have so responded under those

circumstances. *See Sain,* 512 F.3d at 894–95. Even if Plaintiff is correct that Dr. Godiwalla did not recognize the seriousness of his foot condition quickly enough to prevent further injury, negligence is insufficient to meet the high deliberate indifference standard. The Court will not engage with every interaction Dr. Godiwalla had with Plaintiff over the course of the many months of Plaintiff's treatment. Instead, the Court focuses on the aspects of care that Plaintiff argues establishes Dr. Godiwalla's deliberate indifference.

First, Plaintiff argues that Dr. Godiwalla's failure to follow the radiologist's recommendation for a CT scan resulted in a delay of treatment for his toe and unnecessarily prolonged his pain. This recommendation stated, in relevant part: "Recommend a repeat or CT study in 1 week or sooner if symptoms continue to persist or progress. . . Recommend MRI for further evaluation." ECF No. 34-1 at 269. The record indicates that Plaintiff did not receive either a repeat X-ray or a CT within a week of these test results. However, the record also does not reflect that Dr. Godiwalla was aware that Plaintiff's symptoms persisted or progressed during this brief time period. Dr. Godiwalla saw Plaintiff again shortly thereafter on January 12, 2023, and ordered an MRI, consult to podiatry, and medical shoes at that time. Plaintiff has presented no evidence that this delay in ordering the MRI exacerbated his injury or prolonged his pain. *See Petties*, 836 F.3d at 730–31. Plaintiff also presents no evidence that ordering an MRI instead of a CT scan was improper at this juncture. The Court therefore finds the record does not support a finding that Dr. Godiwalla's delay in referring Plaintiff to a specialist for further testing rose to the level of deliberate indifference.

Next, Plaintiff takes issue with Dr. Godiwalla's decision to prescribe the antibiotic Cephalexin to treat his toe condition. Plaintiff argues that Dr. Godiwalla persisted in a treatment known to be ineffective because he had previously been prescribed this medication and he told Dr. Godiwalla that it did not work. The record does not, however, support Plaintiff's contention that Dr. Godiwalla knew at the time that prescribing this antibiotic would be ineffective. First, Plaintiff own account indicates that N.P. Lyon had prescribed the Cephalexin on December 16, 2022—less than one week prior to Dr. Godiwalla's visit with Plaintiff on December 21, 2022. Nothing in the record indicates that the medication would necessarily have resolved Plaintiff's medical issue in such a relatively short period of time. Further, the record is silent on the dosing recommendations that N.P. Lyon and Dr. Godiwalla prescribed for the Cephalexin. Plaintiff presents no evidence that no minimally competent medical provider would have acted any differently in this situation. The Court therefore finds that no reasonable juror could find that Dr. Godiwalla's decision to prescribe Cephalexin at this juncture rose to the level of deliberate indifference.

Next, Plaintiff takes issue with Dr. Godiwalla's decision to order an MRI for Plaintiff despite allegedly knowing that he had bullet fragments in his body that would prevent an MRI from taking place. The Court acknowledges that the parties dispute the facts surrounding this issue and therefore analyzes Plaintiff's version of the facts as the non-moving party. Plaintiff cites to an offsite medical record, showing a finding of a "7 [millimeter] metallic densities" in his chest. ECF No. 41-2 at 2. Plaintiff maintains this shows he was unable to receive an MRI. As Defendant points out, however, nothing in this medical record states that Plaintiff could not

undergo an MRI as a result of this finding. Dr. Godiwalla explains in her declaration that many hospitals perform MRIs on patients who have bullet fragments in their bodies and that hospitals would evaluate patients to determine whether an MRI could be performed. ECF No. 35 ¶¶ 31, 33. Plaintiff has not provided evidence to show that no minimally competent professional would have responded to Plaintiff's condition differently than Dr. Godiwalla did at this time. Dr. Godiwalla may have been negligent in not inquiring further into the specifics of Plaintiff's condition and his ability to receive an MRI; however, negligence is insufficient to show deliberate indifference. As such, the Court does not find that Dr. Godiwalla's actions regarding the MRI rose to the level of deliberate indifference.

Next, Plaintiff's arguments regarding Dr. Godiwalla's August 2023 instructions about elevating his feet during dialysis are unavailing. Plaintiff points to refusal of healthcare forms dated August 9, 2023 and August 14, 2023. ECF No. 41-2 at 3-4. Plaintiff provides that Dr. Godiwalla instructed medical staff to stop requesting Plaintiff to elevate his legs during dialysis. *Id.*; *see also* ECF No. 41 at 5. However, as Defendant points out, Plaintiff's medical record shows that the decision to amputate Plaintiff's toe had already been made prior to these dates, on August 2, 2023. *See* ECF No. 35 ¶¶ 181-184. Nothing in the record indicates that Dr. Godiwalla's recommendation regarding the need for Plaintiff to elevate his feet or not on these dates caused Plaintiff any further injury or pain. Moreover, prior to these dates, the record is replete with instances of Plaintiff refusing to elevate his feet during dialysis. Plaintiff has not sufficiently explained how Dr. Godiwalla's instructions on these dates affected his medical condition

whatsoever. Thus, the Court does not find that Dr. Godiwalla's actions here rose to the level of deliberate indifference.

Finally, the Court does not find that Dr. Godiwalla's actions regarding Plaintiff's pain management rose to the level of a constitutional violation. The Eighth Amendment requires "medical officials who know that an incarcerated patient is suffering to take 'reasonable measures' to alleviate that pain." *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (citing *Arnett*, 658 F.3d at 753–754). However, it does not "entitle incarcerated patients to their preferred pain medication, nor does it impose the unrealistic requirement that doctors keep patients completely pain-free." *Id.* (citing *Arnett*, 658 F.3d at 754; *Snipes*, 95 F.3d at 592). To survive summary judgment, a plaintiff must provide evidence that would allow a reasonable jury to conclude that the defendant was deliberately indifferent to his pain. *Id.* Such evidence may include that "defendants 'persist[ed] in a course of treatment known to be ineffective" or that "defendants' recommended course of treatment was 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (citing *Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020); *Arnett*, 658 F.3d at 75).

While Dr. Godiwalla was aware that Plaintiff's pain was not completely alleviated during his months of treatment, the Eighth Amendment does not require doctors to keep patients completely pain free. As the Seventh Circuit has articulated, "[t]here are many reasons for doctors to tread carefully when prescribing strong pain medications." *Arce*, 75 F.4th at 681. In this case, Plaintiff had a history of substance abuse of opioids. The record shows that Dr. Godiwalla prescribed medications to

treat Plaintiff's pain and adjusted the prescriptions numerous times in an effort to treat Plaintiff's pain for his foot condition. The Court finds the record lacks evidence that would permit a jury to conclude that Dr. Godiwalla's response to Plaintiff's pain was so "blatantly inappropriate" that it demonstrated deliberate indifference. *See Pyles*, 771 F.3d at 409.

In sum, nothing in the record suggests that no competent medical professional would have responded differently to Plaintiff's medical condition than Dr. Godiwalla did. The Court acknowledges that the outcome of Plaintiff's foot condition was incredibly unfortunate and undoubtably a painful experience for Plaintiff. However, a "bad medical outcome is not proof of deliberate indifference." *Hurtado-Meza v. Cannataro*, No. 21-CV-2178, 2023 WL 6164398, at *9 (C.D. Ill. Sept. 21, 2023) (finding the "fact that Plaintiff's toe needed to be amputated does not mean that the care Defendants provided was inadequate"). Plaintiff received an abundance of medical treatment from Dr. Godiwalla and saw numerous other medical providers and specialists in the interim who recommended similar care. Deliberate indifference requires "[s]omething more than negligence or even malpractice." *Pyles*, 771 F.3d at 409. "'[D]eliberate indifference' is a synonym for 'intentional or reckless conduct,' and 'reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred." *Enge v. Obaisi*, No. 13 C 5154, 2016 WL 1359368, at *2 (N.D. Ill. Apr. 6, 2016) (quoting *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999)). The Court cannot draw this inference based on the facts present here. As such, the Court finds that no reasonable jury could find that Dr. Godiwalla was deliberately indifferent to Plaintiff's serious medical needs. The Court

will accordingly grant Defendant's motion for summary judgment on the Eighth Amendment medical claim.[1]

### 3.2 State-Law Negligence

As noted above, Plaintiff has alleged a state-law negligence claim against Defendant, the intricacies of which need not be elaborated on because the Court declines to exercise supplemental jurisdiction over that claim. *See Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) ("When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims."). As such, the Court relinquishes jurisdiction over Plaintiff's state-law claim, which will be dismissed without prejudice.

## 4. CONCLUSION

For the reasons explained above, the Court grants Defendant's motion for summary judgment as to the Eighth Amendment claim and dismisses this claim with prejudice. Additionally, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law negligence claim and thus will dismiss that claim without prejudice.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment, ECF No. 30, be and the same is hereby **GRANTED** as provided in this Order;

---

[1]Defendant also moved for summary judgment based on qualified immunity. ECF No. 31 at 12. Because the Court grants summary judgment on the merits and finds no deliberate indifference based on the undisputed facts, the Court need not reach the question of qualified immunity.

**IT IS FURTHER ORDERED** that Plaintiff's Eighth Amendment deliberate-indifference claim be and the same is hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that the Court, pursuant to 28 U.S.C. § 1367(c), declines to exercise supplemental jurisdiction over Plaintiff's state-law negligence claim, and the state-law negligence claim be and the same is hereby **DISMISSED without prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 21st day of September, 2026.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.